UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BHL BORESIGHT, INC., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-00627 |
| | § | |
| GEO-STEERING SOLUTIONS, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION & ORDER

Pending in the above-referenced cause and addressed in this Order are Defendant Geo-Steering Solutions, Inc. and Geo-Steering Solutions USA, Inc's (collectively, "GSSI") Motion to Dismiss for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 18), Plaintiff BHL Boresight, Inc.'s ("BHL") Motion to Dismiss GSSI Defendants' Counterclaim Counts I–III and VI–VIII for Lack of Subject Matter Jurisdiction and/or Failure to State a Claim (Doc. 27), Defendant Statoil Gulf Services LLC's ("Statoil") Motion to Dismiss for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) and Memorandum in Support Thereof (Doc. 28), Defendant Statoil's Motion for Leave of Court to File a Reply Memorandum to Plaintiff BHL's Opposition of Motion to Dismiss (Doc. 48) and Plaintiff's Opposition and Alternative Motion for Leave to File Surreply (Doc. 56).[1] Having considered the parties' motions, responses, replies, and the relevant law, the Court concludes that BHL's Motion to Dismiss (Doc. 27), Statoil's Motion for Leave of Court to File a Reply Memorandum (Doc. 48), and BHL's Motion for Leave to File Surreply (Doc. 56) should be **GRANTED**. GSSI's Motion to Dismiss (Doc. 27) and Statoil's Motion to Dismiss (Doc. 28) are **GRANTED** in part and **DENIED** in part.

---

[1] The Court is aware that Plaintiff's Opposed Motion for Leave to File First Amended Complaint and Add Additional Parties (Doc. 75) remains pending. However, the Court defers a ruling on that motion at this time. Should Plaintiff wish to update Exhibit 1 to this motion, Plaintiff's First Amended Complaint (Doc. 75-1), in light of the Court's rulings herein, it is advised to do so.

## I. Background

This case arises from a soured business relationship and subsequent claims of license-agreement violations in the highly competitive oil and gas exploration industry. As the leading provider of geosteering software to oil and gas companies, Plaintiff BHL and Defendant Statoil's predecessor-in-interest, Brigham Oil & Gas, L.P. ("Brigham"), enjoyed a mutually beneficial working relationship for many years. (Doc. 1 at ¶ 12.) Pursuant to a 2009 licensing agreement between Brigham and BHL (the "Brigham License Agreement"), BHL provided Brigham access to its proprietary software. (*Id.*)

Under the terms of the Brigham License Agreement, BHL's software was loaded onto Brigham's computers. (*See id.* at ¶¶ 9, 12.) Because BHL's software is encrypted, however, Brigham and other licensees are provided with USB "bitlock" hardware devices as an additional security feature. (*Id.* at ¶ 9.) These bitlocks connect to a single computer, allowing access to the encrypted software on that particular device. (*Id.*) Since each computer running the software requires a bitlock in order to open the software, the licensee's needs determine the number of bitlocks provided. (*Id.*)

A number of years into the Brigham-BHL relationship, Statoil acquired Brigham and became a licensee of BHL's software by virtue of the acquisition. (*Id.* at ¶ 12.) On November 5, 2012, BHL and Statoil amended the Brigham License Agreement to reflect that Statoil would be subject to all terms and conditions of the original agreement between Brigham and BHL. (*Id.* at ¶ 13.) These terms and conditions included provisions stating that Statoil's rights were limited, third-party consultants could only use BHL's software and bitlocks after executing a separate usage agreement with BHL, and any use beyond the express terms and conditions of any sublicense agreement was automatically void and without authority. (*Id.* at ¶¶ 15–18.)

2 / 53

Although BHL permits its licensees to use BHL's software with third-party consulting entities, it only does so "[i]n limited cases, and with advanced notice and prior written agreement." (*Id.* at ¶ 10.) If the consulting entity is a direct competitor in the geosteering software market, the entity is subject to "extensive use restrictions and conditions," including "acknowledgement and protection of BHL's intellectual property." (*Id.*) In this case, BHL only authorized one consultant, Neset Consulting Services, to use its software with Statoil. (*Id.* at ¶ 14.) However, in the fall of 2014, BHL discovered that Statoil had provided BHL's software and bitlocks to GSSI—a new geosteering software provider and direct competitor of BHL. (*Id.* at ¶¶ 21, 23, 25.) When BHL confronted Statoil, it was informed that GSSI was indeed in possession of BHL's bitlocks. (*Id.* at ¶ 25.)

Believing that GSSI used this unrestricted and unauthorized access to develop its own geosteering software program (*Id.* at ¶ 24), BHL initiated this action. BHL brings claims against Statoil and GSSI for violations of the Computer Fraud and Abuse Act ("CFAA") and Electronic Communications Privacy Act ("ECPA") (Counts I–III), unjust enrichment (Count V), and civil conspiracy (Count VIII). (*Id.* at ¶¶ 28–51, 60–64, 77–80.) BHL also alleges misappropriation of trade secrets (Count IV) and civil theft (Count VII) against GSSI and breach of contract (Count VI) against Statoil. (*Id.* at ¶¶ 52–59, 65–76.) GSSI has asserted counterclaims against BHL for: request for declaratory judgment of independent creation of the GSSI software (Count I), request for declaratory judgment that the GSSI software is an original work (Count II), request for declaratory judgment that GSSI did not copy BHL's software in creating GSSI's software (Count III), Lanham Act violation (Count IV), common law unfair competition (Count V), state antitrust violation (Count VI), tortious interference with existing contract (Count VII), and tortious interference with prospective business relationships (Count VIII). (Doc. 19 at ¶¶ 10–56.) All

parties have filed motions to dismiss under either Rule 12(b)(1) or 12(b)(6), which are now ripe for adjudication. (Docs. 18, 27, 28.)

## II. Legal Standard

### A.  12(b)(1)

Federal courts are of limited jurisdiction, possessing only those powers conferred by the Constitution and Congress. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Halmekangas v. State Farm Fire & Cas. Co.*, 603 F.3d 290, 292 (5th Cir. 2010). Consequently, if the court lacks either the constitutional or statutory authority to adjudicate a claim, then the claim shall be dismissed. *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citations omitted). The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884).

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). Because ensuring that a federal court has proper jurisdiction "is fundamental and necessary before touching the substantive claims of a lawsuit," *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 223 (5th Cir. 2012), "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977)).

In examining a Rule 12(b)(1) motion, the district court may consider matters of fact which may be in dispute. *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint

alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Id.* (citing *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996)). The burden of proof lies with the party asserting jurisdiction. *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (citations omitted). A 12(b)(1) motion should only be granted "if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

## B.  12(b)(6)

Motions to dismiss for failure to state a claim are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim. Fed. R. Civ. P. 12(b)(6). Under the Federal Rules, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This requirement exists in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (internal citation marks omitted). Although Rule 8's pleading standard "does not require 'detailed factual allegations,' it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly* at 550 U.S. at 555).

"To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when a court can draw the reasonable inference that the defendant is liable for the misconduct alleged based on the

factual content pled." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). In determining plausibility, courts first disregard "formulaic recitation[s] of the elements" of the legal claim as conclusory. *Id.* at 678. The court then assumes the truth of all factual allegations and determines whether those factual allegations allege a plausible claim. *See id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

 "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). If the facts fail to "nudge[] the[] claims across the line from conceivable to plausible, [then] the[] complaint must be dismissed." *Twombly*, 550 U.S. at 570. On a Rule 12(b)(6) review, "the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996)).

### III. Analysis

#### A. BHL's Motion to Dismiss GSSI's Counterclaims

BHL seeks to have this Court dismiss six of GSSI's eight counterclaims against Plaintiff for lack of subject matter jurisdiction and/or failure to state a claim. (Doc. 27.) Specifically, BHL requests dismissal of the following claims: (1) request for declaratory judgment of independent creation of the GSSI software (Count I); (2) request for declaratory judgment that the GSSI software is an original work (Count II); (3) request for declaratory judgment that GSSI did not copy BHL's software in creating GSSI's software (Count III); (4) state antitrust claim (Count VI); (5) tortious interference with existing contract (Count VII); and (6) tortious interference

with prospective business relationships (Count VIII). GSSI opposes this motion, arguing that it has pleaded its claims sufficiently to withstand BHL's attack. (Doc. 37.) Should the Court disagree, however, GSSI requests leave to amend. (*Id.*)

### a. *Declaratory Judgment Claims of Copyright Non-Infringement (Counts I–III)*

BHL contends that this Court lacks subject matter jurisdiction over GSSI's three counterclaims seeking declarations of copyright non-infringement. (Doc. 27 at 12.) Specifically, BHL argues that because it did not assert a copyright claim in its complaint there is no "substantial controversy of sufficient immediacy and reality between Boresight and the GSSI Defendants to warrant the Court's jurisdiction over these three counterclaims." (*Id.*) GSSI responds that "it cannot be argued that there is not an actual [copyright] case or controversy" for several reasons: (1) BHL's counsel sent a letter threating legal action for alleged violations of BHL's "copyrights;" (2) BHL's complaint states that this Court has jurisdiction under 28 U.S.C. § 1338;[2] (3) BHL's complaint notes that its software devices provide an electronic reminder to the licensed user that "Boresight's Software is subject to copyright protection;" (4) BHL claims sole ownership of the software in its complaint; and (4) BHL seeks remedies exclusive to copyright. (Doc. 37 at 11–13.) Moreover, GSSI asserts that this Court his subject matter jurisdiction over its declaratory judgment counterclaims because "Plaintiff's state law trade secret claims (Count IV) are pre-empted by the Copyright Act."[3] (*Id.* at 16.)

---

[2] "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks." 28 U.S.C. § 1338.

[3] The Court can easily dispose of this argument. Count IV of Plaintiff's complaint is a claim for misappropriation of trade secrets under the Texas Uniform Trade Secrets Act ("TUTSA"). (*See* Doc. 1 at ¶¶ 52–59.) It is well established that a misappropriation of trade secrets claim under TUTSA is not preempted by the Copyright Act because it contains an "extra element" of breach of confidentiality or improper methods, which is not equivalent to any of the exclusive rights of copyright. *Beardmore v. Jacobsen*, 4:13-CV-361, 2015 WL 5530398, at *11 (S.D. Tex. Sept. 18, 2015); *M–I LLC v. Stelly*, 733 F. Supp. 2d 759, 786 (S.D. Tex. 2010); *GlobeRanger Corp. v. Software AG USA, Inc.*, 3:11–CV–0403–B, 2015 WL 3648577, at *4–5 (N.D. Tex. June 11, 2015). This stands in stark contrast to trade secret claims

The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes courts to adjudicate controversies between parties before a conflict blossoms into a larger and costlier claim. The Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has stated that "the phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)).

Accordingly, "[t]he federal Declaratory Judgment Act . . . does not create a substantive cause of action . . . [it] is merely a vehicle that allows a party to obtain an early adjudication of an actual controversy arising under other substantive law." *Perez v. Ocwen Loan Servicing, LLC*, 4:15-CV-1751, 2015 WL 7430920, at *5 (S.D. Tex. Nov. 20, 2015) (alteration in original) (citation and internal citation marks omitted). Because "the availability of such relief presupposes the existence of a judicially remediable right," *Schilling v. Rogers*, 363 U.S. 666, 677 (1960), "a plaintiff cannot use the Declaratory Judgment Act to create a private right of action where none exists." *Reid v. Aransas Cnty.*, 805 F. Supp. 2d 322, 339 (S.D. Tex. 2011) (citation omitted).

When analyzing whether to decide or dismiss a declaratory judgment suit, district courts engage in the three-step inquiry set out in *Orix Credit Alliance, Inc. v. Wolfe,* 212 F.3d 891, 895

---

under TUTSA's predecessor, the Texas Theft Liability Act ("TTLA"), which courts in this district uniformly held was preempted by copyright law. *Beardmore*, 2015 WL 5530398, at *10 (citing *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 598 (5th Cir. 2015)) ("The Fifth Circuit has held theft of trade secrets under § 31.05 as applied to software is preempted by the Copyright Act."). Accordingly, GSSI cannot rely on preemption of Count IV for subject matter jurisdiction of their declaratory judgment claims of copyright non-infringement.

(5th Cir. 2000). The Court must consider: (1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether the court should exercise its discretion to decide or dismiss the action. *Id.* Because the Court decides this case on the first step, it need not discuss the second or third.

### i. *Justiciability: Substantive Cause of Action*

GSSI contends that this Court has subject matter jurisdiction under 28 U.S.C. § 1338(a), which gives a federal court original jurisdiction over any civil action arising under federal copyright law. In its counter complaint, GSSI seeks copyright noninfringement declarations from this Court affirming that: (1) GSSI software was independently created; (2) GSSI software is an original work; and (3) GSSI did not copy BHL software in creating GSSI software. (Doc. 19 at ¶¶ 24, 30, 36.)

The Copyright Act requires that certain conditions be fulfilled before infringement actions may be brought. *See* 17 U.S.C. §§ 401–412. Copyright registration is one such jurisdictional prerequisite to asserting a copyright infringement action. *FedEx Ground Package Sys., Inc. v. Applications Intern. Corp.*, CIV.A. 03-1512, 2008 WL 4279751, at *7 (W.D. Pa. Sept. 12, 2008); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (stating that to prove copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) actionable copying); *Galiano v. Harrah's Operating Co., Inc.*, 416 F.3d 411, 414 (5th Cir. 2005) (same). As the opposite side of the same coin, a number of courts to address the issue have held that this jurisdictional prerequisite applies with equal force to declaratory judgment actions of copyright noninfringement. *See, e.g., Audio Sys. of Florida, Inc. v. SimplexGrinnell LP*, 603CV404ORL22DAB, 2003 WL 25571401, at *3 (M.D. Fla. Sept. 11, 2003) ("[W]here, as here, the Counter-defendant has not made any application for registration,

Counter-claimant's declaratory judgment action for copyright non-infringement is barred"); *Prospect Planet, LLC v. Paychecks for Life.com*, A3-02-91, 2003 WL 751023, at *2 (D.N.D. Jan. 16, 2003) ("Plaintiff's declaratory judgment action for copyright non-infringement is barred because of Defendant's failure to register its copyright"); *Burns v. Rockwood Distrib. Co.*, 481 F. Supp. 841, 849 n.14 (N.D. Ill. 1979) ("defendants cannot rely on 28 U.S.C. § 1338(a) as a basis for federal jurisdiction" of their counterclaim for a declaration of copyright noninfringement because "satisfaction of the jurisdictional prerequisites of copyright registration and recordation . . . is not shown . . . ."). Accordingly, to bring a declaratory judgment action for copyright noninfringement, the declaratory judgment defendant's original complaint should include a copy of the registration certificate, indicate compliance with the registration provisions of the Copyright Act, and include a description of the specific works allegedly copyrighted. *See Burns*, 481 F. Supp. at 845, 845 n.3, n. 14 (N.D. Ill. 1979) (declaratory judgment plaintiff barred from bringing action for noninfringement because declaratory judgment defendant had not indicated compliance with copyright-action prerequisites in her original complaint).

Here, BHL's complaint makes no reference to copyright aside from one brief statement that "Boresight's Software is subject to copyright protection." (Doc. 1 at ¶ 20.) BHL's complaint does not include a registration certificate, indicate compliance with the registration provisions of the Copyright Act, or describe specific works. As a result, it could not assert a copyright infringement claim against Defendants. GSSI's declaratory judgment claims for copyright non-infringement are, therefore, likewise barred.

### ii. *Justiciability: Actual Controversy*

There is another ground for this Court's conclusion that it lacks subject matter jurisdiction over GSSI's copyright non-infringement claims. Like any other action, declaratory

judgment actions must be ripe in order to be justiciable. *Orix*, 212 F.3d at 896 (5th Cir. 2000) (citation omitted). "A declaratory judgment action is ripe for adjudication only where an 'actual controversy' exists." *Id.* (citing 28 U.S.C. § 2201(a)). In order to meet the "actual controversy" requirement, a dispute must be "definite and concrete, real and substantial, and admit of specific relief through a decree of a conclusive character." *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009) (citing *MedImmune*, 549 U.S. at 127). While declaratory judgment actions "cannot be used to seek an opinion advising what the law would be on a hypothetical set of facts," declaratory judgment plaintiffs "need not actually expose themselves to liability before bringing suit." *Id.* (citing *MedImmune*, 549 U.S. at 127, 129–30).

Courts apply a common framework to the justiciability analysis in all patent, copyright, and trademark declaratory judgment suits. *Id.* (citation omitted). Prior to the Supreme Court's decision in *MedImmune*, this was a two-part test, which required the declaratory plaintiff to show: (1) an explicit threat or other action by the [holder of a patent, trademark, or copyright], which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. *See, e.g.*, *Texas v. West Pub. Co.*, 882 F.2d 171, 175 (5th Cir. 1989) (adopting the Federal Circuit's two-part test). *MedImmune* invalidated the first prong of this test. *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007). Consequently, the new "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Although threats of legal action are no longer dispositive in this analysis, they can help establish an actual controversy if they are sufficiently specific and concrete. *Young v. Vannerson*, 612 F. Supp. 2d 829, 840 (S.D. Tex. 2009) (citing *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008)) ("[F]ollowing *MedImmune*, proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy."). Likewise, actual manufacture, use, or sale of a potentially infringing product can indicate the presence of an actual controversy. *Id.* (citing *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1215 (7th Cir. 1980)). Here, the parties are already involved in litigation and GSSI is using contested software.[4] (Doc. 37 at 13.) However, the analysis does not end here.

Both parties cite the same cases, *Vantage Trailers* and *Spindletop Films*, highlighting language and facts relevant to their respective positions. (*Compare* Doc. 27 at 13–14 *with* Doc. 37 at 14–15.) The Court concedes that the applicability of these and other justiciability cases to the facts at hand depends on how the dispute is framed. As the Supreme Court itself has admitted, "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Md. Cas. Co.*, 312 U.S. at 273.

Nevertheless, even were the Court to conclude that the current litigation and the issue of contested software indicates there is some copyright controversy between the parties, it "is less clear . . . whether the controversy is sufficiently immediate and real to render it an 'actual controversy' under the Declaratory Judgment Act." *Wright v. Spindletop Films*, 830 F. Supp. 2d

---

[4] It is important to note that BHL alleges the software was created using misappropriated trade secrets, not that the software is infringing a copyright that BHL owns.

280, 285 (citing *Vantage Trailers*, 567 F.3d at 750–51). Plaintiff did not bring a copyright infringement claim in this case and very likely may never do so (depending on the resolution of the other claims currently pending before the Court and whether it has a valid copyright registration in the first place).[5] As a result, the Court concludes GSSI is essentially requesting an "opinion advising what the law would be upon a hypothetical state of [copyright] facts."[6] *MedImmune*, 549 U.S. at 127 (citation and internal citation marks omitted). Accordingly, there is no dispute that is "definite and concrete, real and substantial . . . and admit[s] of specific relief through a decree of a conclusive character." *Vantage Trailers*, 567 F.3d at 748 (citation and internal citation marks omitted). GSSI's declaratory judgment claims for copyright non-infringement must be dismissed for lack of subject matter jurisdiction.

### b. *State Antitrust Claim (Count VI)*

Count VI of GSSI's counterclaims asserts a state antitrust claim against BHL. (Doc. 19 at ¶¶ 47–49.) GSSI alleges that "[t]hrough the assertion of their claims and this litigation against the GSSI Counter-Plaintiffs, BHL has attempted to stifle competition in an effort to monopolize the geosteering software market in contravention of § 15.01 *et seq.* of the Texas Business and Commerce Code." (Doc. 19 at ¶ 48.) GSSI Defendants also allege that "[t]hrough the assertion of their claims and this litigation against the GSSI Counter-Plaintiffs, BHL has attempted to stifle competition in an effort to monopolize the geosteering consultancy market in contravention of § 15.01 *et seq.* of the Texas Business and Commerce Code." (Doc. 19 at ¶ 49.)

BHL seeks dismissal of the antitrust claim under Rule 12(b)(6). (Doc. 27 at 18–23). BHL claims that GSSI failed to plead the required elements for an antitrust claim. (*Id.*) Specifically,

---

[5] Moreover, as mentioned in the previous section, based on the pleadings it is questionable whether Plaintiff could bring a copyright claim against Defendants in the first place.

[6] *I.e.*, there was a valid, registered copyright, it can be compared to the software that GSSI has developed for purposes of copyright infringement analysis, it was copied, etc.

BHL alleges that GSSI failed to plead anticompetitive conduct, allege damages or injury, and define the relevant market. (*Id.*) BHL also argues that its lawsuit against GSSI is immunized under *Noerr-Pennington* as "protected petitioning" and GSSI cannot plead sham litigation so as to discredit this immunity. (*Id.* at 19–21.) In response, GSSI admonishes the Court to "read the Complaint in its entirety, [because] dismissal of an antitrust claim at the motion to dismiss stage for failure to plead the relevant market adequately should not be done lightly." GSSI goes on:

> In this case, Boresight has alleged that it is the market leader in the U.S. oil and gas exploration industry, which indicates that Boresight exercises substantial market power in the geosteering market, and may in fact be attempting to exercise monopoly power in that market. In view of that fact, GSSI's complaint alleges that Boresight is attempting to use that market power in an effort to stifle competition and monopolize the geosteering software market in contravention of Texas Antitrust law. (Dkt. 19 at ¶¶ 48–49). These allegations, if proved, would largely substantiate GSSI's antitrust claims.

(Doc. 37 at 20.)

Texas antitrust law is founded on federal law. The current Texas Antitrust Act is modeled on both the Sherman Antitrust Act and the Clayton Act and provides that it is to be interpreted in harmony with federal judicial interpretations of federal laws. *Caller-Times Pub. Co., Inc. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992); s*ee also* Tex. Bus. & Com. Code § 15.04 ("The provisions of this Act . . . shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose.").

GSSI's antitrust counterclaim is best characterized as an attempted monopolization claim premised on the "anticompetitive conduct" of BHL's "assertion of their claims and this litigation against the GSSI Counter-Plaintiffs." (Doc. 19 at ¶¶ 48–49.) The provision of the Texas Antitrust Act implicated by this counterclaim is § 15.05(b), which states: "It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."

Tex. Bus. & Com. Code § 15.05(b). This provision mirrors § 2 of the Sherman Antitrust Act.[7] Accordingly, courts look to federal law interpreting § 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act. *Caller-Times*, 826 S.W.2d at 580.

To prevail on an attempted monopolization claim under § 2, a plaintiff must prove: (1) that the defendant engaged in predatory or exclusionary conduct with (2) a specific intent to monopolize the relevant market, and (3) a dangerous probability of achieving monopoly power. *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 839 (5th Cir. 2002) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). Predatory or exclusionary conduct under the first prong is "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)). One type of exclusionary conduct that may form the basis of an antitrust claim is known as "sham litigation."[8] *See Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1552 (S.D. Tex. 1991) ("The remaining exclusionary conduct alleged by Rockbit is sham litigation."); *RPC, Inc. v. Rick Prudhomme*, 2007 U.S. Dist. LEXIS 3946, at *9 (E.D. Tex. Jan. 19, 2007) ("Defendants contend that by initiating litigation against them, Plaintiffs engaged in anti-competitive conduct in violation of § 2 of the Sherman Act and Texas Business and Commerce Code § 15.05 as the litigation 'is a mere sham . . . .' ").

---

[7] Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." 15 U.S.C. § 2.

[8] Although GSSI is not explicit in calling the litigation a "sham," since there are no other allegations of "predatory or exclusionary conduct," the Court treats GSSI's counterclaim, for the purpose of this analysis, as resting on the sham litigation doctrine.

### i.  *Predatory or Exclusionary Conduct: Sham Litigation & Noerr-Pennington*

The First Amendment right to petition the government protects the right to bring suit in state and federal courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). As a corollary to this right, the Supreme Court created the *Noerr-Pennington* doctrine,[9] which immunizes defendants from antitrust liability for engaging in conduct (including litigation) aimed at influencing decision-making by the government. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) (citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993)). Courts recognize only one exception to *Noerr-Pennington*. Under the "sham exception" to this doctrine, "activity 'ostensibly directed toward influencing governmental action' does not qualify for *Noerr* immunity if it 'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.' " *Id.* (quoting *Prof'l Real Estate Investors*, 508 U.S. at 51). In order to constitute sham litigation, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits, and such baseless lawsuit must conceal an attempt to interfere directly with the business relationships of a competitor. *Prof'l Real Estate Investors*, 508 U.S. at 60–61.

Here, BHL filed suit against Defendants alleging violations of the Computer Fraud and Abuse and Electronic Communications Privacy Acts, misappropriation of trade secrets, unjust enrichment, breach of contract, civil theft, and civil conspiracy. (Doc. 1.) Given the allegations as they are laid out in the Original Complaint, the Court cannot say that BHL's claims are baseless. Nor did GSSI allege facts to show otherwise in its antitrust counterclaim. Accordingly, the Court finds that the instant lawsuit is protected activity under the *Noerr-Pennington* doctrine.

---

[9] The *Noerr-Pennington* doctrine was established in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

### i. *Dangerous Probability: Defining the Relevant Market*

Although the Court may stop here, there are additional grounds for this Court's conclusion that GSSI's counterclaims are deficient. The Court also concludes that GSSI's claim should be dismissed under 12(b)(6) because GSSI fails to define the relevant market. "A 'dangerous probability' is analyzed by considering the relevant market and the defendant's ability to lessen or destroy competition in that market." *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1194–95 (S.D. Tex. 2009) (citing *Spectrum Sports*, 506 U.S. at 456, 459). The relevant market must have both product and geographic dimensions. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984) (citing *Fort Worth Nat'l Corp. v. Fed. Sav. and Loan Ins. Corp.*, 469 F.2d 47, 59 (5th Cir. 1972); *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir. 1983)). Moreover, "[i]n order to demonstrate that defendants have the capacity to achieve, let alone a dangerous probability of achieving, monopoly power, a plaintiff must provide evidence that defendants possess some legally significant share of the market." *Benson v. St. Joseph Reg'l Health Ctr.*, CIV.A.H-04-4323, 2007 WL 7120757, at *12 (S.D. Tex. Mar. 22, 2007), *aff'd*, 575 F.3d 542 (5th Cir. 2009) (citing *Domed Stadium*, 732 F.2d at 490).

GSSI half-heartedly attempts to delineate the relevant market by referencing the "geosteering software" and "geosteering consultancy" markets. (*See* Doc. 19 at ¶¶ 48–49.) Unfortunately, these allegations standing alone are inadequate. GSSI does not define the geographic boundaries of the market, and "does not provide allegations about market conditions [or BHL's market power] to assist the Court in determining whether [BHL] might have possessed sustained monopoly power sufficient to support a claim for attempted monopolization." *Rio Grande Royalty*, 786 F. Supp. 2d at 1213. This failure is fatal to GSSI's

counterclaim. *See, e.g.*, *Star Tobacco Inc. v. Darilek*, 298 F. Supp. 2d 436, 448 (E.D. Tex. 2003) (dismissing attempted monopolization counterclaim for failure to "include key factual allegations regarding the composition of the relevant geographic and product markets.");  *Rockbit*, 802 F. Supp. at 1553 (dismissing attempted monopolization claim because "Rockbit's bare allegation that there is a dangerous probability that Baker Hughes will be successful in its attempt to monopolize is insufficient to support its claim. . . . without any allegation of supporting facts").

### c.  *Tortious Interference with Contractual Relationship (Count VII)*

A plaintiff must establish the following elements to succeed on a tortious interference with contract claim: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) that proximately causes damage; and (4) actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (citations omitted); *Specialties of Mex. Inc. v. Masterfoods USA*, 2010 WL 2488031, at *9 (S.D. Tex. June 14, 2010) (citation omitted). To establish intent, "the plaintiff must show either that the interfering party had actual knowledge of the existence of the contract and of the plaintiff's interest in it or that the interfering party had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it." *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 656 (Tex. App.—Corpus Christi 1991, writ denied) (citations omitted). To show proximate cause, "a plaintiff must allege that 'the defendant took an active part in persuading a party to a contract to breach it.' " *Hambric Sports Mgmt., LLC v. Team AK, Inc.*, 2010 WL 2605243, at *9 (N.D. Tex. June 29, 2010) (citing *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 493 (5th Cir. 2008)). In order for liability to arise, "there must be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives . . . ." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 775 (S.D. Tex. 2010) (citation

omitted).

Pointing to *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001), BHL argues that a plaintiff must plead factual allegations that would be actionable under a recognized tort to state a claim for tortious interference with an existing contract. (Doc. 27 at 24) Because GSSI failed to plead independently tortious conduct, BHL insists that GSSI's tortious interference with existing contract claim must be dismissed.[10] (*Id.* at 24–26.) BHL misreads *Sturges*. *Sturges* involved claims for tortious interference with *prospective* business relations, not with an existing contract. *See Sturges*, 52 S.W.3d at 726 ("We therefore hold that to recover for *tortious interference with a prospective business relation* a plaintiff must prove that the defendant's conduct was independently tortious or wrongful.") (emphasis added). Indeed, as another district court bound to Texas law and addressing an argument identical to BHL's concluded:

> Texas law—perhaps reflecting a desire to afford *existing* contracts more protection than prospective ones, as well as to distinguish between actionable interference and desirable competition during that period before a contract is formed—appears to require only that the alleged interference with an existing contract be "willful and intentional."

*U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC*, 966 F. Supp. 2d 690, 705 (W.D. Tex. 2013) (collecting cases).

Here, GSSI alleges that it had an existing service agreement with Statoil and "[t]hrough the assertion of its wanton, specious, baseless, and malicious claims, BHL willfully and intentionally interfered with the service agreement, affecting and interrupting the scope of the service agreement and the relationship between the parties moving forward." (Doc. 19 at ¶¶ 51–52.) Although it need not allege independently wrongful conduct and it has adequately alleged

---

[10] More particularly, BHL argues that GSSI's failure to present facts that indicate BHL's conduct in filing the lawsuit would be actionable under a recognized tort dooms both tortious interference claims. (Doc. 27 at 25.)

the existence of a contract subject to interference, GSSI must plead the remaining elements of tortious interference with existing contract in order to state a claim. However, nowhere does GSSI set forth facts that allege how BHL interfered with the existing GSSI-Statoil contract, or that it persuaded Statoil to breach the contract. Nor does GSSI allege damages. GSSI has therefore failed to allege all of the required elements of its claim—but not for the reason that BHL asserts. The Court will afford GSSI an opportunity to remedy these deficiencies by amending its pleading.

### d.  *Tortious Interference with Prospective Business Relationships (Count VIII)*

As already alluded to, Texas law also protects prospective contracts and business relations from tortious interference, albeit with different rules. *Sturges*, 52 S.W.3d at 713. In order to prevail on a tortious interference with prospective business relationships claim, the plaintiff must establish: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (citations omitted); *Stelly*, 733 F. Supp. 2d at 775.

BHL argues that GSSI's pleading is "devoid of any facts giving rise to tortious interference." (Doc. 27 at 24–27.) Specifically, BHL points to GSSI's failure to point out how BHL's actions were "independently wrongful," offer any factual support or allegations of damages other than a conclusory statement that it was "harmed", or plead proximate cause. (*Id.*)

GSSI responds by announcing that it "has likewise pleaded a claim . . . for tortious interference with prospective business relationships," reciting the elements of a tortious interference with prospective business relationships claim and concluding with a nearly verbatim repetition of the allegations from its complaint.[11] (Doc. 37 at 20–21.) The Court agrees with BHL that these allegations are insufficient to state a claim for tortious interference with prospective business relationships for a number of reasons.

### i. *Prevention of Business Relationship*

In this case, GSSI acknowledges that it had a contract with Statoil and uses that contract as the basis for its tortious interference with existing contractual relationship counterclaim. Consequently, as a basis for its tortious interference with prospective business relationships claim, it must plead facts indicating that BHL's "wanton, specious, baseless, and malicious claims" prevented the formation of another contract. *See Enercorp*, 966 F. Supp. 2d at 702–03 ("[B]ecause Enercorp acknowledges that it did consummate a contract with SEPCO, it must, at a minimum, plead facts that would indicate that Defendants prevented the formation of *another* contract—one that was separate and distinct from the one eventually consummated.") GSSI has not done so.

GSSI includes no factual allegations of any prospective business relationship aside from the conclusory statement that "[t]he GSSI Counter-Plaintiffs had a reasonable probability of entering into a business relationship with a third party." (Doc. 19 at ¶ 54.) Courts in this district have found that far more detailed allegations are insufficient. For example, in concluding that plaintiff's allegations were insufficient in *M-I LLC v. Stelly*, the court stated:

---

[11] "The GSSI Counter-Plaintiffs had a reasonable probability of entering into a business relationship with a third party. BHL asserted its wanton, specious, baseless and malicious claims against the GSSI Counter-Plaintiffs with the intent of harming their ["GSSI's"] business and the market for their geosteering services and the GSSI Software . . . . The GSSI Counter-Plaintiffs have been harmed, resulting in actual damages and the loss of prospective contracts." (Doc. 37 at 21.)

> M–I fails to set forth any allegations establishing a reasonable probability that it would have entered into a business relationship. The closest it comes is its averment that it "has provided [w]ellbore cleanout tools and services to BP for other ThunderHorse wells, and expected to provide the same for 778 # 2," but instead lost the project to WES. (Doc. No. 355, ¶ 29.) This statement, however, does not plead a reasonable probability that M–I and BP would have entered into a contractual relationship for the ThunderHorse project. Furthermore, M–I fails to plead any other business relationships that are the subject of this claim.

733 F. Supp. 2d at 776.

GSSI's claim is even less complete than the one in *Stelly*. GSSI does not name what third parties or contracts it refers to, preventing the Court from inferring that there was a reasonable probability that GSSI would have entered into a business relationship with a third party. Its claim is subject to dismissal on this ground.

### ii. *Conscious Desire*

"Intentional interference does not require intent to injure, only that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Sw. Bell Tel. Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (citations and internal citation marks omitted). Absent actual knowledge of the prospective contract or business relation, interference cannot be intentional. *Texas Oil Co. v. Tenneco Inc.*, 917 S.W.2d 826, 834 (Tex. App.—Houston [14th Dist.] 1994), *rev'd on other grounds sub nom. Morgan Stanley & Co., Inc. v. Texas Oil Co.*, 958 S.W.2d 178 (Tex. 1997). Moreover, interference is not improper if the defendant "had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose . . . ." *Bradford v. Vento*, 48 S.W.3d 749, 757 (Tex. 2001) (quoting Restatement (Second) of Torts § 766B cmt. d (1979)) (internal citation marks omitted).

Here, GSSI summarily alleges intent by stating "BHL asserted its wanton, specious, baseless, and malicious claims against the GSSI Counter-Plaintiffs with the intent of harming

their business and the market for geosteering services and the GSSI software." (Doc. 19 at ¶ 55.) Without more, this claim cannot survive. It is utterly devoid of any factual allegation that BHL had actual knowledge of a prospective business relation and its desire to interfere in that relation was its primary purpose in doing so. *See Stelly*, 733 F. Supp. 2d at 776 (dismissing claim because "M–I has not pled that Defendants committed misappropriation and/or breach of fiduciary duty with a conscious desire to cause, or with the certain knowledge that, it was preventing MI's specific business relationship from forming."). GSSI's claim may be dismissed for this deficiency as well.

### iii.  *Independently Tortious Conduct*

The Supreme Court of Texas has made it clear that to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. *Sturges*, 52 S.W.3d at 726. " 'Independently tortious' means that the conduct objected to would violate 'some other recognized tort duty.' " *Star Tobacco*, 298 F. Supp. 2d at 448 (citing *Sturges*, 52 S.W.3d at 713). "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations . . . ." *Sturges*, 52 S.W.3d at 726.

Wrongful litigation may be used as the basis for a tortious interference claim. *Strategic Capital Corp. v. New Strong Grp. Ltd.*, 4:08-CV-1651, 2012 WL 6202182, at *10 (S.D. Tex. Dec. 12, 2012) ("Litigation is a powerful weapon, and when instituted in bad faith for the purpose of causing damage or loss, it is a wrongful method of interference.") (quoting *Hughes v. Hous. Nw. Med. Ctr., Inc.*, 680 S.W.2d 838, 842 (Tex. App.—Houston [1st Dist.] 1984, *writ ref'd n.r.e.*)); *McCall v. Tana Oil & Gas Corp.*, 82 S.W.3d 337, 347 (Tex. App.—Austin 2001), *rev'd in part on other grounds*, 104 S.W.3d 80 (Tex. 2003) (same). Malice may not. *Sturges*, 52

S.W.3d at 724. However, litigation is not "wrongful" if instituted (1) in a bona fide exercise of the defendant's own rights or (2) pursuant to a good faith assertion of colorable legal rights. *Pers. Preference Video, Inc. v. Home Box Office, Inc.*, 986 F.2d 110, 111–12 (5th Cir. 1993) (citing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex. 1991); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1271 (5th Cir. 1991)).

In this case, it is unclear from GSSI's pleading what BHL conduct was allegedly "independently tortious or unlawful." GSSI's claim is barred to the extent it argues malice as the basis for the claim. However, even assuming GSSI asserts wrongful litigation as the independently tortious act of interference, it fails to allege bad faith in instigating this lawsuit. Accordingly, its claim may be dismissed on this ground as well.

### iv.  *Proximate Cause*

In a tortious interference claim, "a plaintiff must be able to show that the act of interference was the proximate cause of the damages suffered by it." *Tex. Campaign for the Env't v. Partners Dewatering Int'l, LLC*, 13-14-00656-CV, 2016 WL 300233, at *10 (Tex. App.—Corpus Christi Jan. 21, 2016, no pet.) (citation and internal citation marks omitted). The components of proximate cause are cause in fact and foreseeability. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005) (citation omitted). The test for cause in fact, or "but for causation," is whether the act or omission "was a substantial factor in causing the injury without which the harm would not have occurred." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (citation and internal citation marks omitted). "Foreseeability" means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his act created for others. *Lunn v. Fragomen, Del Rey, Bensen & Loewy P.C.*, CIV.A. H-04-404, 2006 WL 492098, at *7 (S.D. Tex. Feb. 28, 2006) (citing *Doe* 907 S.W.2d at 478). "In other words, proximate

cause is that cause, unbroken by any new and independent cause, that produces injury and without which the injury would not have occurred." *Tex. Campaign for the Env't*, 2016 WL 300233, at *10 (citations omitted).

Without clear allegations of (1) the prospective relationship(s) interfered with; (2) the independently tortious or unlawful activity BHL employed to interfere with such relationships; and (3) damages sustained,[12] the Court cannot reasonably infer proximate causation. Accordingly, GSSI's claim may likewise be dismissed on this ground. *C.f. In re Burzynski*, 989 F.2d 733, 739 (5th Cir. 1993) (finding proximate cause sufficiently pled when other essential elements of tortious interference were sufficiently pled and connected).[13]

### v.  *Damages*

Aside from its conclusory statement that "the GSSI Counter-Plaintiffs have been harmed, resulting in actual damages and the loss of prospective contracts" (Doc. 19 at ¶ 56), the Court concludes that GSSI "also fail[s] to allege facts or explain how or whether [GSSI] suffered any actual damage or loss." *Seeberger Bank of Am., N.A. Ventures Trust 2013 I.H.R. v. Seeberger*, EP-14-CV-366-KC, 2015 WL 9200878, at *22 (W.D. Tex. Dec. 16, 2015). This too is fatal to GSSI's counterclaim. However, the Court will afford GSSI an opportunity to replead in order to properly assert each element of its claim.

## B.  Defendants' Motions to Dismiss

In their motions to dismiss, GSSI and Statoil both argue that BHL fails to allege facts that adequately plead violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and

---

[12] See *infra*, Section III.A.d.v.

[13] At that time, the essential elements of tortious interference with existing contract under Texas law were the same as they are now: intentional act, contract existence, proximate cause, and damages. *In re Burzynski*, 989 F.2d at 738. Although *In re Burzynski* dealt with a tortious interference with existing contract claim, the Court believes the proximate-cause analysis is equally applicable to a tortious interference with prospective relationship claim.

Electronic Communications Privacy Act, 18 U.S.C. § 2701, (Counts I–III). (Docs. 18 at 6–13, 36 at 7–16.) GSSI ends its offensive here, but Statoil additionally attacks the sufficiency of BHL's unjust enrichment and civil conspiracy claims (Counts V, VIII). (Doc. 28 at 16–23.) BHL responds that its claims are sufficient, however, if the Court disagrees, it seeks leave to amend. (Doc. 36 at 11–12.)

### a.  *CFAA (Counts I – GSSI & II – Statoil)*

The CFAA punishes various fraudulent and damaging activities related to the use of computers. Although primarily a criminal statute, under § 1030(g) civil actions are authorized for some violations of its substantive provisions. *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1156 (5th Cir. 2006); *see* 18 U.S.C. § 1030(g).[14] In order to maintain a civil action, a party must "suffer[] damage or loss by reason of a violation of . . . section [1030]." 18 U.S.C. § 1030(g).

Utilizing the civil liability provision, BHL alleges that both Statoil and GSSI violated §§ 1030(a)(2), 1030(a)(4), and 1030(a)(6). (Doc. 1 at ¶¶ 34, 36, 45, 47.) The only provision of § 1030(a)(2) that is implicated by the facts of this case prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access," thereby "obtain[ing]

---

[14] The full text of 18 U.S.C. § 1030(g) reads:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses[4] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

information from any protected computer."[15] 18 U.S.C. § 1030(a)(2)(C). Section 1030(a)(4) prohibits the "knowing[ ] . . . access[ of] a protected computer without authorization," and "with intent to defraud," if "such conduct furthers the intended fraud and [the violator] obtains anything of value."[16] 18 U.S.C. § 1030(a)(4). And the relevant section of 1030(a)(6) proscribes trafficking "knowingly and with intent to defraud . . . in any password or similar information through which a computer may be accessed without authorization" when "such trafficking affects interstate or foreign commerce."[17] 18 U.S.C. § 1030(a)(6).

With regard to the CFAA claims, GSSI argues that BHL fails to allege that GSSI accessed a protected computer or acted without or in excess of authorization. (Doc. 18 at 6–10.) Statoil joins GSSI in this assertion (Doc. 28 at 10–11), but it additionally argues that BHL fails

---

[15] The full text of 18 U.S.C. § 1030(a)(2) reads:

> Whoever—intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . (A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.); (B) information from any department or agency of the United States; or (C) information from any protected computer . . . shall be punished as provided in subsection (c) of this section.

[16] The full text of 18 U.S.C. § 1030(a)(4) reads:

> Whoever—knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period . . . shall be punished as provided in subsection (c) of this section.

[17] The full text of 18 U.S.C. § 1030(a)(6) reads:

> Whoever—knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if—(A) such trafficking affects interstate or foreign commerce; or (B) such computer is used by or for the Government of the United States . . . shall be punished as provided in subsection (c) of this section.

to allege a cognizable loss under the CFAA (Doc. 28 at 7–10). BHL responds that it has sufficiently pleaded all elements of its CFAA claims, but seeks leave to amend if the Court decides otherwise. (Docs. 24 at 7–17, 36 at 9–18.) The Court will address each of the three elements that Defendants take issue with in turn: (1) "protected computer;" (2) "access . . . without authorization or exceed[ing] authorized access;" and (3) "loss."

### i. *Protected Computer*

The CFAA defines a "computer" as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but . . . does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device . . . ." 18 U.S.C. § 1030(e)(1). A "protected computer" is one "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). However, the term "facility" as used in the phrase "data storage facility or communications facility" within the definition of "computer" is not defined. *See* 18 U.S.C. § 1030.

GSSI argues that BHL fails to allege the "protected computer" element of its claim because BHL's complaint states that GSSI's unauthorized access was to "Boresight's Software and bitlocks." (Doc. 18 at 7.) GSSI avers that bitlocks are simply USB storage devices, and because neither software nor bitlocks are high speed data processing devices, they are not covered by the plain language of the statute. (*Id.*) GSSI also argues that because BHL alleges that Statoil provided BHL's bitlocks to GSSI to access BHL's software without BHL's authorization, BHL "at best alleges that the GSSI Defendants received the Boresight Software using the bitlock storage devices, but does not allege access to a *computer*." (Doc. 18 at 8.) (emphasis added).

GSSI goes on to cite a district court case from Maryland for the proposition that "[r]eceiving electronic information is . . . not the same as 'accessing' the computer from which the information is derived . . . ." (*Id.*) Finally, GSSI avers that BHL's complaint "clearly alleges that the *access to the software* was unauthorized," however, the CFAA only provides a cause of action "for *accessing a protected computer* without authorization or exceeding authorization." (Doc. 18 at 9.) (emphasis in original).

BHL responds by distinguishing the main case relied upon by GSSI and arguing that the legislative history of the CFAA confirms the broad scope of the meaning of "protected computer." (Doc. 24 at 10–11.) BHL further avers that, at this stage, it need only allege sufficient facts to allow the Court to reasonably infer that the computers Defendants used may meet the interstate or foreign commerce requirement for its software and bitlocks to fall within the plain language of "protected computer"—a requirement that it claims it has fulfilled. (*Id.* at 11–13.) In its response to Statoil, BHL also claims that "[t]he Complaint clearly alleges facts that indicate that Boresight's 'information' that Statoil accessed and obtained must function with an individual computer," thereby bringing it within the plain language of the statute. (Doc. 36 at 12–13.)

In light of the second phrase of the definition of "computer," courts regularly conclude that systems and devices that function with individual data processing devices are covered by the statute. *See, e.g.*, *Genesco Sports Enter., Inc. v. White*, 3:11-CV-1345-N BF, 2011 WL 6593415, at *5 (N.D. Tex. Oct. 27, 2011), *report and recommendation adopted,* 3:11-CV-1345-N BF, 2011 WL 6433704 (N.D. Tex. Dec. 22, 2011) (corporate server is protected computer); *Donahue v. Tokyo Electron Am., Inc.*, 42 F. Supp. 3d 829, 843 (W.D. Tex. 2014) (computer network is protected computer). *See also NovelPoster v. Javitch Canfield Group*, No. 13-cv-05186-WHO,

2014 U.S. Dist. LEXIS 106804, at *13 n.4 (N.D. Cal. Aug. 4, 2014) (online accounts are protected computer). Here, BHL's complaint alleges that the information Defendants obtained resides on computers and the computer network and its bitlock devices and software function with these covered devices. (Doc. 1 at ¶ 30, 38, 40.) Moreover, by alleging the bitlocks are USB devices (Doc. 1 at ¶ 9), the Court can infer they provide data storage functions, potentially bringing them within the ambit of the definition of a computer ("computer . . . includes any data storage facility . . . directly related to or operating in conjunction with such [data processing] device."). Without further factual development on the interplay of the software, network, bitlocks, and individual computers to negate this inference, the Court can reasonably infer that BHL's software and bitlocks fall within the CFAA's definition of a "protected computer." BHL has sufficiently pled this element of its CFAA claim.

### ii. *Authorized Access*

The CFAA does not define "authorization" or "authorized access." *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007). However, it clearly differentiates between unauthorized users and those who exceed authorized access. *Id.* (citing 18 U.S.C. §§ 1030(e)(6), 1030(a)(1), (a)(2), (a)(4)) (internal citation marks omitted). The term "exceeds authorized access" is defined in § 1030(e)(6): "the term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter . . . ." *United States v. John*, 597 F.3d 263, 270–71 (5th Cir. 2010) (quoting 18 U.S.C. § 1030(e)(6)). As the Fifth Circuit has noted, "[i]n conditioning the nature of the intrusion in part on the level of authorization a computer user possesses, Congress distinguished between 'insiders, who are authorized to access a computer,' and 'outside hackers who break into a computer.' " *Phillips*, 477 F.3d at 219 (citing S.Rep. No.

104–357, at 11 (1996); S.Rep. No. 99–432, at 10, *as reprinted in* 1986 U.S.C.C.A.N. 2479, at 2488 (1986)). Accordingly, "courts typically analyze[] the scope of a user's authorization to access a protected computer on the basis of the expected norms of intended use or the nature of the relationship established between the computer owner and the user." *Id.*

GSSI claims that it could not access a computer without authorization or by exceeding authorization because GSSI owned the computers on which the BHL software was accessed. (Doc. 18 at 9.) Building on this argument, GSSI cites a Northern District of California case to claim that "it is the owner of the protected computer that decides whether someone is authorized to access its computer's [sic] or not." (*Id.* at 9–10.) (alteration in original). GSSI then concludes that it cannot act without authorization because either GSSI or Statoil—as the owners of the computers on which the software was accessed—determine access. (*Id.* at 9–10.)

Statoil joins GSSI's offensive, citing the Ninth Circuit's decision in *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012), to argue that ownership of the protected computer is dispositive to access. (Doc. 28 at 10–11.) Because "Statoil accessed its own computers to use and view BHL's software as authorized by the licensing agreement between the parties," Statoil claims that "BHL has not alleged that Statoil acted in a manner which would run afoul of the CFAA." (*Id.* at 11.) At most, BHL alleges "unauthorized disclosure or use of information," which is not actionable under the statute. (*Id.*)

In its response to GSSI, BHL argues there is no ownership or control of the computer required for a CFAA claim, citing a number of non-binding cases in support. (Doc. 24 at 9–10, 14–17.) (citing *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004); *State Analysis Inc. v. American Financial Servs. Assoc.*, 621 F. Supp. 2d 309, 316 (E.D. Va. 2009); *AtPac, Inc. v. Aptitude Solutions, Inc.*, 2010 U.S. Dist. LEXIS 42109, *14 (E.D. Cal. Apr. 28, 2010);

*Secureinfo Corp. v. Telos Corp.*, 387 F. Supp.2d 593, 609 (E.D. Va. 2005)). Instead, it argues, the central issue in third-party computer cases is the scope of the authorization to access the data. (*Id.* at 14–17.) BHL also cites several cases for the proposition that authorization is exceeded when defendants violate the terms of a prior grant of authorization, either by subterfuge or express breach of agreement. (*Id.* at 15–16.) (citing *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581–82 (1st Cir. 2001); *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125 (W.D. Wa. 2000); *State Analysis*, 621 F. Supp. 2d at 316; *AtPac*, 2010 U.S. Dist. LEXIS 42109, at *12–13).

BHL renews a number of these arguments in its response to Statoil. (Doc. 36 at 13–18.) Specifically directed at Statoil, however, is BHL's argument that although Statoil may have had authorization to access BHL's software initially, it contractually agreed that it would forfeit all rights of access immediately upon breach of the license agreement. (*Id.* at 14–15.) When Statoil granted access to GSSI, Statoil's authorization was void from that point forward. (*Id.* at 14.) BHL also argues that Statoil's reliance on Ninth Circuit law is "neither instructive or binding" since the Fifth Circuit has held that the CFAA should be "broadly construed." (*Id.* at 15.)

Circling back to the argument regarding how access is determined, BHL cites *United States v. John* for the proposition that in the Fifth Circuit, "access to a computer or data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded." (*Id.* at 16.) Citing to *John*'s rejection of the Ninth Circuit's interpretation of the CFAA in *Brekka* as too narrow, BHL alleges that *Brekka* is easily distinguishable. (*Id.*) (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009)). BHL points out that in rejecting the plaintiff's argument that defendant's authorized computer access was exceeded when he accessed and used stored information to further his own competing business, the *Brekka* court

specifically noted that there was no written agreement governing access terms and no written guidelines prohibiting the employee from emailing documents to a personal computer. (*Id.* at n.8.) According to BHL, both *John* and *Brekka* actually support BHL's argument that a CFAA claim exists when there is an agreement delineating the parameters of authorized use, which is then exceeded. (*Id.* at 16–17.) Because BHL's complaint alleged that Statoil and BHL had such an agreement specifically prohibiting disclosure to or access by a third-party consultant such as GSSI, and providing for automatic, immediate revocation of authorized use as the penalty for such unauthorized conduct, BHL argues it has stated a claim for civil liability under the CFAA. (*Id.* at 18.)

Initially, the Court notes that to the extent Statoil argues that BHL's complaint should be dismissed because Statoil had authorization to the software and bitlocks, this type of argument is a merits argument that is irrelevant at this stage. *See Simmonds Equip., LLC v. GGR Int'l, Inc.*, CIV.A. H-15-0862, 2015 WL 5089169, at \*5 (S.D. Tex. Aug. 27, 2015) ("GGR's argument that Simmonds' CFAA claim should be dismissed because GGR had lawful access . . . is a merits argument not relevant for purposes of determining whether Simmonds has stated a claim for which relief may be granted."); *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, A-14-CA-877-SS, 2014 WL 7237411, at \*13 (W.D. Tex. Dec. 17, 2014) ("Janssen argues the CFAA claim should be dismissed because she accessed the computer with authorization and for the purpose of doing her job. This is a merits argument and irrelevant at the Rule 12 stage.").

Moving on to the issue of pleading sufficiency, in light of the plain language of the statute, several courts—including one recently within our circuit—have determined that there is no ownership requirement of the protected computer at issue to state a viable CFAA claim. *See St. Jude*, 2014 WL 7237411, at \*13 (citation omitted) ("The Court sees no support for Janssen's

position there is an ownership requirement."); *Theofel*, 359 F.3d at 1078 ("The district court erred by reading an ownership or control requirement into the Act. . . . Nothing in the provision's language supports the district court's restriction. Individuals other than the computer's owner may be proximately harmed by unauthorized access, particularly if they have rights to data stored on it."). The Court agrees with these authorities' reading of the statute. Accordingly, BHL's complaint need not be dismissed because it alleges that GSSI and Statoil accessed the software and bitlocks at issue using GSSI and Statoil computers and computer networks.

Defendants are correct to note that there has been some disagreement among the circuits as to how broadly or narrowly to interpret the CFAA. Pointing out that the CFAA was targeted at computer hackers, some authorities have argued that it only applies in situations where an outsider, or someone without authorization, accesses a computer. *State Analysis*, 621 F. Supp. 2d at 315 (internal citations omitted). These courts have rejected attempts to apply the CFAA to cases where defendants did not break into a system, but simply abused the privileges of a license. *Id.* Other courts, however, including a majority in this circuit, have held that the CFAA does apply to authorized users who use programs in an unauthorized way, such as when users obtain and use proprietary information in violation of employer policies or confidentiality or licensing agreements.[18]

---

[18] *See, e.g.*, *John*, 597 F.3d at 272 (defendant exceeded access by knowingly violating terms of acceptable-use policy as part of illegal scheme); *Phillips*, 477 F.3d at 221, 221 n.5 (noting that "authorized access typically arises only out of a contractual or agency relationship" and finding defendant subject to CFAA because he violated acceptable computer use policy and accessed sites he had no authorization to access) (collecting cases); *Beta Tech., Inc. v. Meyers*, CIV.A. H-13-1282, 2013 WL 5602930, at *3 (S.D. Tex. Oct. 10, 2013) (plaintiff stated a claim under CFAA when it alleged that defendant violated employment and computer-use policies); *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439 (N.D. Tex. 2004) (alleging access contrary to use-agreement policies and in spite of express warnings sufficient to allege unauthorized access for CFAA claim); *Frisco Med. Ctr., L.L.P. v. Bledsoe*, 4:12-CV-37/4:15CV105, 2015 WL 7734108, at *9 (E.D. Tex. Nov. 30, 2015) (access violating terms of confidentiality and security agreements signed by defendants constitutes access in excess of authorization for CFAA liability); *Donahue*, 42 F. Supp. 3d at 843 (allegation that plaintiff's access was in violation of "Confidentiality Agreement, Certification, and Defendants' Software Policy and Code of

Defendants cite a number of cases in support of their contentions that (1) exceeding the terms of a licensing agreement or duty of loyalty is insufficient to demonstrate that an individual exceeds authorization; and (2) third-party defendants cannot be liable where their access was made possible by another party violating its license agreement with the plaintiff. *See* (Doc. 18 at 9–10; Doc. 28 at 10–11) (citing *Nosal*, 676 F.3d at 862–63; *NovelPoster*, 2014 U.S. Dist. LEXIS 106804, at *24–25). The Court is unswayed by these authorities. The Fifth Circuit has clearly stated, "[a]ccess to a computer and data that can be obtained from that access may be exceeded if the purposes for which access has been given are exceeded." *John*, 597 F.3d at 272. As illustrated by footnote 16, this pronouncement has been broadly applied within this circuit.

The only potential concern the Fifth Circuit has expressed about finding CFAA liability when the access terms of an employment policy or license/confidentiality agreement have been exceeded is in the criminal context. *See id.* at 272–73. In *John*, the Fifth Circuit examined the Ninth Circuit's *Brekka* decision in detail, noting that the Ninth Circuit declined to find civil liability in a case in which the defendant breached a state law duty of loyalty to his employer by accessing and using information he was entitled to access to further his own competing business.

Ethics" was sufficient to state unauthorized access or exceeding authorized access under CFAA); *Meats by Linz, Inc. v. Dear*, 3:10-CV-1511-D, 2011 WL 1515028, at *3 (N.D. Tex. Apr. 20, 2011) (plaintiff stated CFAA claim when it alleged facts that allowed the court to draw the reasonable inference that defendant accessed plaintiff's computer system and used information on it in violation of a restrictive covenant agreement and without plaintiff's consent); *Genesco*, 2011 WL 6593415, at *5 (allegation that defendant "ha[d] no right accessing" plaintiff's computer sufficient to state a claim under the CFAA). *See also*, *Associated Pump & Supply Co., LLC v. Dupre*, CIV.A. 14-9, 2014 WL 1330196, at *6 (E.D. La. Apr. 3, 2014) (concluding that the *John* decision indicates that the Fifth Circuit would likely recognize a CFAA claim for civil liability when defendant is alleged to have accessed and misused information in contravention of a broad confidentiality delineating the scope of authorized access); *Total Safety v. Rowland*, CIV.A. 13-6109, 2014 WL 6485641, at *21 (E.D. La. Nov. 18, 2014) (citing favorably *Dupre*'s discussion of the Fifth Circuit's likelihood to recognize liability when a defendant accesses and misuses information in contravention of a confidentiality agreement). *Cf. Bridal Expo, Inc. v. van Florestein*, CIV.A. 4:08-CV-03777, 2009 WL 255862, at *11 (S.D. Tex. Feb. 3, 2009) (finding that plaintiffs were unlikely to succeed on their CFAA claim because defendants "had signed no confidentiality agreement with Bridal Expo or any other agreement restricting their access to the files they had been working with at their jobs at Bridal Expo" and, therefore, did not act in excess of their authorization).

*Id.* at 273. As the court stated:

> The Ninth Circuit's reasoning in *Brekka* was influenced by its recognition that "[f]irst, and most important, § 1030 is primarily a criminal statute, and §§ 1030(a)(2) and (4) create criminal liability for violators of the statute." The court explained its view that, "[a]lthough this case arises in a civil context, our interpretation of [the statute] is equally applicable in the criminal context," and that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." The Ninth Circuit explained that "[i]f the employer has not rescinded the defendant's right to use the computer, the defendant would have no reason to know that making personal use of the company computer in breach of a state law fiduciary duty to an employer would constitute a criminal violation of the CFAA. It would be improper to interpret a criminal statute in such an unexpected manner.
>
> *There are no such concerns in the present case.*

*Id.* (quoting *Brekka*, 581 F.3d at 1134–35) (emphasis added).

As in *John*, there are no such concerns in this case. There are no criminal ramifications for Defendants here. There is, therefore, no need to reinterpret Fifth Circuit precedent—particularly since Judge Kozinski's invitation to do so was not addressed to this Court.[19]

---

[19] As Judge Kozinski noted in *Nosal*, a case on which Defendants heavily rely, the Fifth Circuit has not yet been faced with an opportunity to differentiate between the licensee and third-party in defining the parameters of exceeding or lacking authorization:

> We remain unpersuaded by the decisions of our sister circuits that interpret the CFAA broadly to cover violations of corporate computer use restrictions or violations of a duty of loyalty. *See United States v. Rodriguez,* 628 F.3d 1258 (11th Cir. 2010); *United States v. John,* 597 F.3d 263 (5th Cir. 2010); *Int'l Airport Ctrs., LLC v. Citrin,* 440 F.3d 418 (7th Cir. 2006). These courts looked only at the culpable behavior of the defendants before them, and failed to consider the effect on millions of ordinary citizens caused by the statute's unitary definition of "exceeds authorized access." They therefore failed to apply the long-standing principle that we must construe ambiguous criminal statutes narrowly so as to avoid "making criminal law in Congress's stead." *United States v. Santos,* 553 U.S. 507, 514, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008).
>
> We therefore respectfully decline to follow our sister circuits and urge them to reconsider instead.

*Nosal*, 676 F.3d at 862–63.

Moreover, in *Brekka*, the Ninth Circuit was faced with a situation in which the defendant and employer "did not have a written employment agreement, nor did LVRC promulgate employee guidelines that would prohibit employees from emailing LVRC documents to personal computers." *Brekka*, 581 F.3d at 1129. In contrast, BHL's complaint clearly alleges that (1) BHL never granted access to GSSI; (2) BHL never granted Statoil permission to share access to BHL's software and bitlocks with GSSI; (3) BHL and Statoil had an express license agreement delineating the terms of Statoil's access and providing for automatic forfeiture of access privileges in case of breach; (4) GSSI accessed the software and bitlocks through Statoil; and (5) Statoil continued to access the software and bitlocks after it breached the license agreement. (Doc. 1 at ¶¶ 11, 15–19, 21–22, 25–26, 30, 32, 40.) The Court finds these allegations are more than sufficient to allow the Court to draw the inference that GSSI and Statoil acted without authorization and/or exceeded authorization.

### iii.   *Cognizable Loss*

The civil-claims provision of the CFAA states that "any person who suffers damage or loss by reason of a [§ 1030] violation . . . may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). However, the provision goes on to limit civil actions to only those situations involving one of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). *Id.* The only subclause potentially applicable here is subclause (I), which covers "loss to 1 or more persons during any 1–year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program,

system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Based on this language, courts have concluded that the term "loss" encompasses only two types of harm: costs to investigate and respond to an offense, and costs incurred because of a service interruption. *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 630 (S.D. Tex. 2011) (citations omitted). "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

Although BHL's complaint avers that it sustained damage "exceeding $5,000 in a single calendar year," it goes on to list its losses as "reduced business, harm to its goodwill, and loss of licensing fees associated with the use of Boresight's Software." (Doc. 1 at ¶¶ 32, 34.) Statoil argues that this is insufficient because BHL fails to allege that Statoil's conduct involves either of the type of costs recognized by this Court and the CFAA—costs to investigate and respond to an offense or costs incurred because of a service interruption. (Doc. 28 at 9.) The Court agrees.

In its response, BHL appears to attempt to remedy this defect by stating that BHL "incurred in-house labor costs when investigating, assessing, and quantifying the extent/reach of Statoil's infractions" and then listing the man hours a number of its employees spent on the investigation. (Doc. 36 at 11.) However, as Statoil correctly notes in its Motion for Leave to File Reply Memorandum (Doc. 48), BHL's averments are too little, too late. Without converting the parties' motions to ones for summary judgment, the Court is bound to the pleadings. Fed. R. Civ. P. 12(b)(6). *See, e.g.*, *Clark v. Tarrant Cnty.*, 798 F.2d 736, 745 (5th Cir. 1986) ("The district court considered matters outside the pleadings in ruling on the Rule 12(b)(6) motion to dismiss for failure to state a claim, so that, as expressly provided in Rule 12(b)(6), the motion to dismiss was converted into a motion for summary judgment under Fed. R. Civ. P. 56."); *Collins v.*

*Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing Fed. R. Civ. P. 12(b)(6))

("In considering a motion to dismiss for failure to state a claim, a district court must limit itself

to the contents of the pleadings, including attachments thereto."). Without allegations that allow

the Court to infer that Defendants are liable for cognizable losses under the CFAA, the Court

must conclude that BHL's complaint runs afoul of Rule 12(b)(6) requirements. *See Stelly*, 733 F.

Supp. 2d at 780 ("M–I's . . . claim fails because M–I does not allege any facts showing at least

$5,000 of loss, or any loss as a result of investigation or interruption of computer service.") BHL

may replead its CFAA claim to allege cognizable loss.

### b.  *ECPA (Count III)*

In 1986, Congress passed the Electronic Communications Privacy Act, Pub.L. No. 99–

508, 100 Stat. 1848, which was intended to afford privacy protection to electronic

communications. Title I of the ECPA amended the federal Wiretap Act, which previously had

addressed only interception of wire and oral communications, to also address interception of

electronic communications. *See* Pub.L. No. 99–508, 100 Stat. 1848; S.Rep. No. 99–541, at 3

(1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557; 18 U.S.C. §§ 2510(12); 2511(1)(a); *Konop*

*v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002); *United States v. Steiger*, 318 F.3d

1039, 1046–47 (11th Cir. 2003). At the same time, Title II of the ECPA created the Stored

Communications Act ("SCA") to cover access to stored communications and records. *See* Pub.L.

No. 99–508, 100 Stat. 1848; S.Rep. No. 99–541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N.

3555, 3557; 18 U.S.C. § 2701(a); *Konop*, 302 F.3d at 874; *Steiger*, 318 F.3d at 1047.

The potential breadth of these statues and the date of last amendment make them

notoriously difficult for modern courts to grapple with. As the Ninth Circuit has noted:

> [T]he intersection of these . . . statutes is a complex, often convoluted, area of the
> law. [T]he difficulty is compounded by the fact that the ECPA was written prior

> to the advent of the Internet and the World Wide Web. As a result, the existing
> statutory framework is ill-suited to address modern forms of communication . . . .
> Courts have struggled to analyze problems involving modern technology within
> the confines of this statutory framework, often with unsatisfying results. [U]ntil
> Congress brings the laws in line with modern technology, protection of the
> Internet . . . will remain a confusing and uncertain area of the law.

*Konop*, 302 F.3d at 874 (citations and internal citation marks omitted) (collecting law review

articles criticizing judicial interpretations of the ECPA). Part of the confusion arising from the

ECPA comes from the courts' application of the statutory definitions to a vast and ever growing

list of electronic systems and devices that interface with "electronic communications."

The ECPA provides a cause of action against anyone who "intentionally accesses without

authorization a facility through which an electronic communication service is provided; or

intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or

prevents authorized access to a wire or electronic communication while it is in electronic storage

in such system." 18 U.S.C. §§ 2701(a)(1), 2707(a). "Accordingly, for Defendants to be liable

under the SCA, they must have gained unauthorized access to a facility through which electronic

communication services are provided (or the access must have exceeded the scope of authority

given) and must thereby have accessed electronic communications while in storage." *Garcia v.

City of Laredo*, 702 F.3d 788, 791 (5th Cir. 2012).

In attacking the sufficiency of BHL's ECPA claims, GSSI argues that BHL fails to allege

that GSSI "accessed a facility through which an electronic communication service is provided"

or "obtained, altered, or prevented authorized access to a wire or electronic communication while

it is in electronic storage." (Doc. 18 at 11–13.) Statoil joins GSSI in arguing that BHL fails to

allege that Defendants accessed a "facility" recognized by the ECPA. (Doc. 28 at 12–14.)  Statoil

also argues that BHL admits Statoil's access was authorized and, therefore, fails to state a claim

that access was unauthorized or exceeded. (*Id.* at 14–15). Finally, Statoil alleges that BHL's

position is counter to the purpose of the SCA.[20] (*Id.* at 15–16.)

Essentially, the parties here dispute whether the terms "facility," "electronic storage," and "access" are applicable to the facts alleged in BHL's complaint. While the SCA does not define the term "facility," it does define the terms "electronic communication," "electronic communication service" and "electronic storage." *See* 18 U.S.C. § 2510. " 'Electronic communication' means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." *Id.* § 2510(12). The statute defines an "electronic communication service" ("ECS") as "any service which provides to users thereof the ability to send or receive wire or electronic communications." *Id.* § 2510(15). "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." *Id.* § 2510(17).

### i. *Facility*

Courts have had no trouble concluding that the terms "electronic communication service" and "facility" comfortably fit providers of communication services—such as telephone companies, Internet or email service providers, and bulletin board services—and the facilities they use to operate these services. *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457, 462 (5th Cir. 1994) (electronic bulletin board system allowing for email communication is electronic communication service); *United States v. Councilman*, 418 F.3d 67,

---

[20] Since we are only dealing with Title II of the ECPA, *i.e.*, the SCA, the Court uses the terms ECPA and SCA interchangeably.

81–82 (1st Cir. 2005) (email service is electronic communication service); *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 508 (S.D.N.Y. 2001) (Internet access is electronic communications service); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (company email service is electronic communication service); *Theofel*, 359 F.3d at 1075 (ISP is electronic communication service). Importantly to the case at bar, however, the term has not been constrained to these obvious entities. Several courts have determined that the term also encompasses protected websites and databases. *State Analysis*, 621 F. Supp. 2d at 313 (searchable, proprietary online database available only by subscription sufficiently alleges electronic communication service for ECPA claim); *Konop*, 302 F.3d at 879 (password-protected website is electronic communication service).

Notably, a majority of the opinions interpreting "electronic communication service" do not explicitly state what the "facility" is that functions with the service. As a result, it is difficult to determine what characteristics define the relationship between a facility and an electronic communications service. However, a careful reading of these cases indicates that the services at issue all depend on or interact with a network or server. This conclusion is bolstered by a number of recent district court decisions.

The majority of federal courts to address the facility question have done so in the context of personal devices, such as desktop computers, laptops, and mobile phones. The courts have held, nearly universally, that such devices are not "facilities" under the Act.[21] In reaching this

---

[21] *See, e.g.*, *Garcia*, 702 F.3d at 792–93 (noting that courts agree that a home computer is not protected by the SCA and finding that defendant's argument that her cell phone was a facility under the statute was unsupported by legislative history or other courts' decisions); *Cousineau v. Microsoft Corp.*, 6 F. Supp. 3d 1167, 1174–75 (W.D. Wash. 2014) (discussing similar cases and concluding that mobile device is not "facility" under SCA); *In re iPhone Application Litigation*, 844 F. Supp. 2d 1040, 1057–58 (N.D. Cal. 2012) (analyzing a number of cases and concluding that those that have concluded an individual's computer, laptop, or mobile device are not "facilities" subject to ECPA have the better reasoning); *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1204 (S.D. Cal. 2008) ("It is questionable whether

conclusion, these courts "have consistently concluded that an individual's personal computer does not 'provide [] an electronic communication service' simply by virtue of enabling use of electronic communication services." *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1058 (N.D. Cal. 2012) (citing *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270–71 (N.D. Cal. 2001)).

Accordingly, courts attempting to define what makes a "facility" distinct have recently begun to coalesce around the idea that server-like functions are a necessary attribute of a "facility." As one district court has observed: "Notably, cases after *iPhone* have determined that for a device to be a "facility" under the SCA, "it must perform server-like functions." *Vaquero Energy, Inc. v. Herda*, 1:15-CV-0967-JLT, 2015 WL 5173535, at *11 (E.D. Cal. Sept. 3, 2015); *see also In re Pharmatrak, Inc. Privacy Litig.*, 220 F. Supp. 2d 4, 13 (D. Mass. 2002), *rev'd on other grounds sub nom. In re Pharmatrak*, 329 F.3d 9 (1st Cir. 2003) ("While it is possible for modern computers to perform server-like functions, there is no evidence that any of the Plaintiffs used their computers in this way."); *Cousineau v. Microsoft Corp.*, 6 F. Supp. 3d 1167, 1175 (W.D. Wash. 2014) (concluding that plaintiff's phone not a "facility" because it "did not provide location services to other users in a server-like fashion . . . .").

---

the laptop computer qualifies as a 'facility through which an electronic communication service is provided.' "); *Freedom Banc Mortg. Servs., Inc. v. O'Harra*, 2:11-CV-01073, 2012 WL 3862209, at *9 (S.D. Ohio Sept. 5, 2012) (stating that computers are not relevant facilities that SCA is designed to protect); *Steiger*, 318 F.3d at 1049 (holding that computer hard drive is beyond the reach of the SCA); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1271 (N.D. Cal. 2001) (argument that computer is "facility" subject to SCA is "destined to failure"); *In re Pharmatrak, Inc. Privacy Litig.*, 220 F. Supp. 2d 4, 13 (D. Mass. 2002), *rev'd on other grounds sub nom. In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003) (stating that personal computer is not facility under SCA); *Roadlink Workforce Solutions L.L.C. v. Malpass*, No. 13–5459–RBL, 2013 WL 5274812, at *3 (W.D. Wash. Sep. 18, 2013) (following reasoning in *iPhone* that personal computing devices are not "facilities" under SCA); *Morgan v. Preston*, No. 13–0403, 2013 WL 5963563, at *5 n.3 (M.D. Tenn. Nov. 7, 2013) (citing numerous cases to demonstrate that "overwhelming body of law" supports conclusion that personal computer is not a facility); *Lazette v. Kulmatycki*, 949 F. Supp. 2d 748, 755–56 (N.D. Ohio June 5, 2013) (explaining why reasoning in *iPhone* is persuasive).

BHL's complaint alleges that by accessing the software and using the bitlocks, GSSI and Statoil obtained access to electronic communications that "were in electronic storage in that database." (Doc. 1 at ¶ 49.) Elsewhere in the complaint BHL states that the unauthorized use of the bitlocks granted GSSI and Statoil access to BHL's software, which was accessed through either Statoil or GSSI's computer network. (*Id.* at 40.) Finally, BHL avers that its software and trade secrets, reside on "computers and the computer network." (*Id.* at 29, 38.)

Although BHL's allegations are not a model of clarity in apprising this Court how the software, bitlocks, individual computers, and the computer networks function, at this stage, Plaintiff's averments still allow the Court to draw a reasonable inference that its software and bitlocks come within the ambit of the ECPA. The Court notes, however, that upon further factual development regarding the functions performed by BHL's software and bitlocks, it may become apparent that BHL was overly optimistic in asserting an ECPA claim.

### ii. *Electronic Storage*

To state a claim under the SCA, BHL must show not only that Defendants accessed a "facility through which an electronic communication service is provided," but furthermore, that Defendants "obtain[ed], alter[ed], or prevent[ed] authorized access to a wire or electronic communication while it [was] in electronic storage in such system . . . ." 18 U.S.C. § 2701(a). The SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

A number of courts have read subsection (A) of the definition of "electronic storage" narrowly, concluding that data residing on an individual's hard drive or cell phone is not in

electronic storage because, unlike emails waiting on the server to be delivered to the recipient, it is not in "temporary, intermediate storage" as required by the Act. *See, e.g.*, *Garcia*, 702 F.3d at 793 (citations omitted); *In re DoubleClick*, 154 F. Supp. 2d at 512; *In re iPhone*, 844 F. Supp. 2d at 1059. Nevertheless, subsection (B) provides an alternative avenue to qualification as electronic storage. *See Theofel*, 359 F.3d at 1076 ("By its plain terms, subsection (B) applies to backup storage regardless of whether it is intermediate or post-transmission.").

Here, BHL simply alleges that the software and data therein was accessed using the bitlocks and "[t]hrough these actions, Defendants . . . violated Title II of the ECPA." (Doc. 1 at ¶¶ 49–50.) These conclusory allegations are insufficient to give rise to an inference that the data resides in "temporary, intermediate" storage or is stored "for purposes of backup protection" as required to demonstrate "electronic storage" under the SCA. BHL may attempt to rectify this inadequacy in an amended pleading.

### iii. *Access*

Statoil is correct to note that authorized users cannot be held liable under § 2701 of the ECPA. *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F. Supp. 2d 552, 558–59 (N.D. Tex. 2005) (plaintiffs fail to state a § 2701 claim because "their amended complaints each assert that American authorized AAI to disclose the PNRs to TSA."). Under § 2701(c)(1), a party is excepted from liability if the conduct is authorized by the provider of the electronic communications service, which in this case would be BHL. However, unlike the plaintiffs' complaints in *In re American Airlines*, BHL's complaint clearly alleges that (1) BHL and Statoil had an express license agreement delineating the terms of Statoil's access and providing for automatic forfeiture of access privileges in case of breach, and (2) Statoil continued to access the software and bitlocks after it breached the license agreement. (Doc. 1 at ¶¶ 15–19, 21–22, 25–26,

30, 49.) This is sufficient to allege unauthorized access under the ECPA.

Moreover, it is worth mentioning that BHL likewise sufficiently alleges unauthorized access by GSSI. Section 2701(c) also allows those who are "authorized by a user" (i.e., third-party users) of the electronic communication service to access a communication "of or intended for that user." 18 U.S.C. § 2701(c)(2). The plain language of § 2701(c)(2) indicates that only a "user" of the service can authorize third-party access to the communication. The statute defines "user" as one who "1) uses the electronic communication service; and 2) *is duly authorized by the provider of such service to engage in such use.*" 18 U.S.C. § 2510(13) (emphasis added).

Because the statutory language is unambiguous, it must control the construction of the statute, notwithstanding the legislative history. *United States v. Turkette*, 452 U.S. 576, 580 (1981). Accordingly, GSSI would be authorized only if Statoil was "duly authorized" at the time access was granted. As already discussed, however, BHL has clearly alleged that Statoil's license agreement provided for immediate revocation of access privileges if access was granted to a third party without BHL's consent. Accordingly, Statoil was no longer a "duly authorized" user capable of providing third-party authorization at the time it did in fact provide access to GSSI. BHL has sufficiently pleaded unauthorized access for both Statoil and GSSI.

### c.  *Unjust Enrichment (Count V - Statoil Only)*

Count Five of BHL's complaint asserts a claim for unjust enrichment against GSSI and Statoil. (Doc. 1 at ¶¶ 60–64.) Statoil asks this Court to dismiss this claim, arguing that because the parties had a contractual relationship outlining the terms of Statoil's use of BHL's software, and BHL failed to plead that the contract was invalid for any reason, BHL is precluded from

asserting this claim under Texas law. (Doc. 28 at 16–17.)[22]

In Texas, when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage, he may recover under a theory of unjust enrichment. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). However, "[u]njust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels*, 832 S.W.2d at 42 (citation and internal citation marks omitted). Texas courts have also made it clear that "unjust enrichment is based on quasi-contract and is unavailable when a valid, express contract governing the subject matter of the dispute exists." *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001) (citations omitted); *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 196 n.32 (5th Cir. 2010) (citation omitted); *McGowan & Co., Inc. v. Bogan*, 93 F. Supp. 3d 624, 652 (S.D. Tex. 2015) (citations omitted).

The dispute in this case arises from Statoil's use of BHL's software and bitlocks in breach of its agreement with BHL. BHL's complaint clearly alleges that Statoil and BHL had a license agreement that expressly governed both Statoil's use of the software and bitlocks and its right to share them with third-party consultants. (Doc. 1 at ¶¶ 13–15.) This averment dooms Plaintiff's claim. Because a valid, express contract governs the terms of Statoil's use of BHL's software and outlines remedies for breach, Plaintiff's claim for unjust enrichment against Statoil must be dismissed.

### d. *Civil Conspiracy (Count VIII)*

Statoil seeks dismissal of Plaintiff's civil conspiracy claim on the ground that it is

---

[22] Statoil also argues that Plaintiff's unjust enrichment claim is preempted by the Copyright Act. (Doc. 28 at 22–23.) Because the Court agrees with Statoil's primary argument, the Court need not address this secondary attack.

completely preempted by the Copyright Act. (Doc. 28 at 17–22.) Statoil relies heavily on *Stelly* to make this argument. (*Id.* at 21–22.) Plaintiff responds that Statoil erroneously characterizes the underlying tort in its civil conspiracy claim as unauthorized copying and use of BHL's software rather than as the breach of the confidential relationship with BHL, and therefore, misreads *Stelly*. (Doc. 36 at 27–29.)

Section 301(a) of the Copyright Act "accomplishes the general federal policy of creating a uniform method for protecting and enforcing certain rights in intellectual property by preempting other claims." *Daboub v. Gibbons*, 42 F.3d 285, 288 (5th Cir. 1995). The Fifth Circuit follows a two-step approach to determine whether a state-law claim is preempted by § 301. *Id.* at 288–89. At the first step, "the cause of action is examined to determine if it falls within the subject matter of copyright." *Id.* at 289 (citation and internal citation marks omitted). "Second, the cause of action is examined to determine if it protects rights that are equivalent to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106." *Id.* (citation omitted).

### i. *Step One: Subject Matter of Copyright*

In applying this test to cases involving software, the Fifth Circuit has made it clear that software falls within the ambit of 301. *See, e.g.*, *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 786 (5th Cir. 1999) (concluding that operating system software is tangible media falling within the subject matter of copyright); *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 597 (5th Cir. 2015) ("computer software is a tangible medium protected by the Copyright Act."). However, "claims not wholly limited to software" are broader than the scope of copyright protection. *GlobeRanger Corp. v. Software AG*, 691 F.3d 702, 709 (5th Cir. 2012).

Here, BHL alleges that Statoil misappropriated BHL's proprietary software in breach of

the parties' confidential relationship. However, the extent of the allegedly misappropriated trade secrets—and whether software is solely at issue—is not clearly described in the complaint. (Doc. 1 at ¶¶ 77–80.) If more than software is at issue, then BHL would survive the first step of the analysis. On the other hand, if software is solely at issue, the dispositive question is whether BHL's civil conspiracy claim protects rights that are "equivalent" to any of the exclusive rights protected by copyright. Regardless of whether software is solely at issue, however, the Court concludes that BHL's claim survives. This is because BHL's claim is premised on an underlying tort that does not "protect[] rights that are 'equivalent' to any of the exclusive rights of a federal copyright as provided in 17 U.S.C. § 106." *Daboub*, 42 F.3d at 289 (citations omitted).

### i. *Step Two: Equivalency*

The Fifth Circuit "evaluate[s] the equivalency of rights under what is commonly referred to as the 'extra element' test." *Alcatel*, 166 F.3d at 787. For example, "[s]ection 106 [of the Act] grants the holder of a copyright the exclusive right to reproduce, distribute, perform, and display the copyrighted work." *Kane v. Nace Intern.*, 117 F. Supp. 2d 592, 597 (S.D. Tex. 2000) (alteration in original) (quoting *Daboub*, 42 F.3d at 289) (internal citation marks omitted). Thus, "[a] state law claim protects rights equivalent to [a] federal copyright claim where the core of the state law theory of recovery speaks to wrongful copying." *Stelly*, 733 F. Supp. 2d at 783 (citing *Daboub*, 42 F.3d at 289.

Conspiracy is considered a derivative tort because liability is presumed on participation in some underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (citation omitted). The elements of civil conspiracy in Texas are: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and

(5) damages as the proximate result. *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 823 F. Supp. 2d 578, 588 (S.D. Tex. 2011) (citations omitted); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998). Specific intent is required. *Triplex Commc'ns Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995).

In evaluating the elements of civil conspiracy in the context of the extra-element test, this Court has concluded that " 'the intent element of the conspiracy claim does not constitute qualitatively different conduct where the element of intent only goes to an intent to form an agreement to copy and use' copyrightable trade secrets and confidential information." *Ultraflo*, 823 F. Supp. 2d at 588 (quoting *Stelly*, 733 F. Supp. 2d at 791). In this case, however, the underlying tort that the intent element attaches to is misappropriation of trade secrets—a claim that courts have concluded is not preempted by the Copyright Act, because it includes an "extra element" of breach of confidentiality or improper methods, which is not equivalent to any of the exclusive rights of copyright. *Id.* at 587 (citing *Stelly*, 733 F. Supp. 2d at 786); *GlobeRanger*, 2015 WL 3648577, at *4–5; *Emerald City Mgmt., LLC v. Kahn*, 4:14-CV-358, 2016 WL 98751, at *18 (E.D. Tex. Jan. 8, 2016) (citations omitted); *see also Stromback v. New Line Cinema*, 384 F.3d 283, 303–304 (6th Cir. 2004) (collecting cases). Because the underlying tort alleged in this case (trade-secret misappropriation) survives the extra-element test and conspiracy is a derivative tort, this Court concludes that Plaintiff's civil conspiracy claim is likewise not preempted by § 301.

## C.  Defendant Statoil's Motion for Leave to File a Reply Memorandum

Statoil filed its Motion for Leave to File a Reply Memorandum to Plaintiff's Opposition of Motion to Dismiss on August 6, 2015. (Doc. 48.) In its preliminary statement, Statoil states that its purpose in filing the brief is to "make this [C]ourt aware of new, controlling precedent,"

and to "identify for the [C]ourt, numerous allegations contained" in BHL's brief "that are not set forth in the complaint and therefore, must not be considered on a motion to dismiss." (Doc. 48-2 at 2.) In this motion, Statoil argues that *Spear Marketing*—a case that Statoil alleges has numerous "similar, if not identical" claims as those in the case at bar—dictates a favorable outcome for Statoil's motion to dismiss. (Doc. 48 at 2 n.1.) BHL opposes Statoil's motion, arguing that *Spear Marketing* has no bearing on the arguments in Statoil's Motion to Dismiss" because it "does not address or change the existing law regarding preemption of conspiracy and unjust enrichment claims by the Copyright Act." (Doc. 56 at 1.) BHL also argues that "[i]n its proposed Reply, Statoil . . . proposes for the first time that all of Boresight's trade secrets are embodied completely in its software, thus implying that that [sic] copyright preemption of Boresight's state-law claims may be appropriate in this case." (*Id.* at 2.) Because this is a new argument not raised in Statoil's original motion to dismiss, BHL asks this Court to deny Statoil's motion. (*Id.* at 4.) In the alternative, BHL requests leave to file a surreply if the Court grants Statoil's motion because "no injustice would exist where Boresight is given a fair opportunity to respond." (*Id.* at 3–4.)

The Court initially notes that BHL is correct in pointing out that *Spear Marketing* has little to no bearing on Statoil's motion to dismiss[23] and that Statoil raises a new argument in its proposed reply. Moreover, while it appreciates Statoil's eagerness to assist, the Court is capable of determining what "must not be considered on a motion to dismiss" on its own. However, in the interest of having full briefing on all issues raised in the pending motions, the Court grants Statoil leave to file its reply memorandum. However, for the same reason—and in fairness to BHL—the Court likewise grants BHL leave to file its surreply.

---

[23] The Court agrees with BHL because *Spear Marketing* deals with the TTLA rather than the TUTSA, and as explained in *supra* note 3, the two statutes dictate a different result in the copyright preemption analysis.

51 / 53

## IV. Conclusion

As discussed, the Court finds that it lacks subject matter jurisdiction of GSSI's declaratory judgment claims. This is an incurable defect. Accordingly, these claims must be dismissed with prejudice.

The Court also finds that a number of the parties' claims fail to meet the 12(b)(6) standard. However, the Court will grant the parties' requests for leave to amend these claims rather than dismissing them outright. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.") The Court believes that additional allegations could cure the existing deficiencies. For the forgoing reasons, the Court hereby

**ORDERS** that Plaintiff BHL's Motion to Dismiss (Doc. 27) is **GRANTED**, Defendant Statoil's Motion to Dismiss (Doc. 28) is **GRANTED** in part and **DENIED** in part, and Defendant GSSI's Motion to Dismiss (Doc. 18) is **GRANTED** in part and **DENIED** in part. Accordingly, GSSI's declaratory judgment counterclaims (Counts I–III) are dismissed for lack of subject matter jurisdiction and the following claims are dismissed, without prejudice, for failure to state a claim:

- BHL's ECPA claim (Count III)
- BHL's unjust enrichment claim against Statoil (Count V)
- GSSI's state antitrust counterclaim (Count VI)
- GSSI's tortious interference with existing contract counterclaim (Count VII)
- GSSI's tortious interference with prospective business relationships counterclaim (Count VIII)

The parties shall have 21 days to amend their pleadings to conform with the Court's rulings. It is further

**ORDERED** that Defendant's Motion for Leave to File a Reply Memorandum to Plaintiff's Opposition of Motion to Dismiss (Doc. 48) is **GRANTED**. BHL's Motion for Leave to File Surreply (Doc. 56-1) is likewise **GRANTED**.

SIGNED at Houston, Texas, this 29th day of March, 2016.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE